**14 PAGES**
Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
411 30ᵀᴴ Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: gnuti@nutihart.com
      chart@nutihart.com
      kcoleman@nutihart.com

Proposed Attorneys for Matheson Flight Extenders, Inc.
and Matheson Postal Services, Inc., Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>MATHESON POSTAL SERVICES, INC,<br>A California Corporation<br><br>            Debtor. | Case No.: 22-21149<br><br>Chapter 11<br><br>**DECLARATION OF CHARLES MELLOR IN SUPPORT OF FIRST DAY MOTIONS**<br><br>**DCNs: NH-1, NH-2, and NH-3**<br><br>*Motion to Shorten Time Pending*<br>Date:    May 9, 2022 **(requested)**<br>Time:    11:00 a.m.<br>Place:    Department C<br>              501 I Street, 6th Flr., Crtrm. 35<br>              Sacramento, CA 95814<br>Judge:   Hon. Christopher M. Klein |

I, Charles Mellor, hereby declare and state as follows:

1. I am the Chief Restructuring Officer of Matheson Flight Extenders, Inc. ("MFE") and Matheson Postal Services, Inc. ("MPS") (each a "Debtor" and collectively, "Debtors"). I also have been appointed Chief Restructing Officer of Matheson Trucking Inc. ("MTI" or "Trucking"). I have been part of the Matheson Executive Management Team since 2014 and have held the positions of Senior Vice President of Operations, General Counsel, Chief Legal Officer, and most recently, Chief Operations Officer.

2. MFE is wholly owned by Joe Garrett, Inc., a California corporation. The Joe Garrett, Inc. Board of Directors unanimously resolved to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and appointed me as the "Authorized Officer" of MFE. My duties include, without limitation, the right to: (1) act in the name of, and on behalf of, MFE; (2) retain legal counsel, financial advisors, accountants, and other professionals as necessary; (3) sign any and all petitions, schedules, motions, lists, applications and pleadings, as necessary or desirable in connection with a Chapter 11 case.

3. MPS is a privately held corporation managed by a board of directors comprised of the same individuals as Joe Garrett, Inc. and is a subsidiary of MTI. The MPS Board of Directors unanimously resolved to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and appointed me as the "Authorized Officer" of MPS. My duties include, without limitation, the right to: (1) act in the name of, and on behalf of, MPS; (2) retain legal counsel, financial advisors, accountants, and other professionals as necessary; (3) sign any and all petitions, schedules, motions, lists, applications and pleadings, as necessary or desirable in connection with a Chapter 11 case.

4. In the event it becomes necessary to file a petition under Chapter 11 for MTI, I have been appointed the Authorized Officer and vested with the same powers and duties to act for MTI that are referenced in paragraphs 2 and 3.

5. I submit this declaration in support of the following:

    a. Motion to Authorize Payment of Pre-Petition Employee and Related Obligations, and to Authorize Use of Cash Collateral for That Purpose;

    b. Motion Authorizing Debtor to: (A) Maintain Existing Bank Accounts, and (B) Continue Use of Cash Management System; and

    c. Motion for Order Authorizing Joint Administration of Cases of Matheson Flight Extenders, Inc. and Matheson Postal Services, Inc. (collectively, "First Day Motions").

6. Except as otherwise indicated, I know the following of my own personal knowledge and could and would testify competently thereto if called upon to do so.

7. The Debtors filed voluntary Chapter 11 bankruptcy petitions on May 5, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division ("Bankruptcy Court"), Case Nos. 22-21148 and 22-21149. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

*Overview of Business Operations*

8. The Debtors provide extensive mail handling services under contracts with the United States Postal Service ("USPS" or the "Postal Service") and others. The relationship between the Matheson family of companies and USPS began in 1964, and at the time of this filing the Debtors' rank 11th out of the Top 100 USPS Suppliers nationwide in terms of revenue ($194,561,160.00).

9. MFE has been providing services to the USPS since December 1998. Starting in 2019, MFE began providing terminal handling services at Terminal Handling Stations ("THS") for the USPS as part of the USPS's campaign to reduce costs by outsourcing components of its operations. MFE presently operates 38 THS sites throughout the United States. THSs are located at or adjacent to airports and act as interfaces between the USPS and FedEx, which carries the majority of mail transferred via air for the Postal Service. MFE employees pick up mail from FedEx aircraft and transport it to the THS site, where it is then sorted and placed into containers that are either returned to waiting aircraft or loaded onto trucks that transfer the mail over the road to other postal facilities.

10. MFE also operates six (6) Surface Transfer Centers (STC) for the USPS located in: Atlanta, Georgia; Brandywine, Maryland; Chicopee, Massachusetts; Kansas City, Missouri; Long Beach, California; and Sacramento, California. There are currently thirteen (13) STCs nationwide.

11. STCs receive all classes of mail (First-Class Mail, Priority Mail, parcels, etc.) from the USPS, which is then consolidated, distributed, and routed to their further destinations through a designated surface transportation network. STCs reduce the overall cost of mail delivery by diverting volume from higher-cost air to lower-cost surface transportation, and by

serving as concentration points for consolidating mail from under-utilized surface trips, while at the same time fulfilling the USPS's on-time delivery requirements. In short, STCs serve as essential hubs coordinating the efficient and accurate delivery of mail nationwide.

12. MFE leases or sub-leases the real property housing its STCs, and each building is approximately 300,000 to 450,000 square feet. MFE also leases or subleases the real property housing its THS facilities, which range in size from 15,000 to 150,000 square feet. The facilities are equipped *inter alia* with freight loading docks, state of the art high-speed sorting equipment, sophisticated scanning labelling and tracking devices, and conveyors that load and unload, sort, and route mail and freight.

13. MFE's contracts with the USPS account for approximately eighty-five (85%) percent of its business. MFE generated gross revenues of $111,518,838.00 for its fiscal year ending June 30, 2021, and gross revenues from the period July 1, 2021 through March 31, 2022 of approximately $85.3 million.

14. STCs operate 24 hours per day, seven days a week. THSs generally operate daily and overnight 6 days a week. MFE's work force consists of approximately 2,480 full and part-time employees.

15. MFE pays its employees weekly. Each pay period ends at 12:00 noon on Sunday, and employees are paid the following Friday. In order to allow paychecks to be distributed on time, the aggregate amount of wages and associated payroll taxes must be withdrawn from MFE's accounts by its payroll administrator no later than 10:00 a.m. on Thursday of each week.

16. From 12:01 p.m. on Sunday May 1, 2022 through May 5, 2022, MFE accrued wage obligations that ordinarily are due and payable on May 13, 2022. The aggregate amount of payroll due on May 13, 2022 (which covers the pre-petition period and the post-petition period May 6 to noon May 8, 2022) is estimated to be $1,420,600.00. (The final amount will be calculated by Wednesday, May 11.)

17. MFE cannot operate without its employees. I have received reports that employees of MFE, MPS and their related companies have threatened to quit outright or simply not appear for work if the company is late in making regular payroll and other benefit payments.

Based thereon, I believe that any delay in payment of employee compensation would cause employees to terminate their service and/or otherwise adversely affect their productivity resulting in significant disruption to MFE's operations.  Therefore, there is a critically important business reason for the Debtor to be permitted to pay the pre-bankruptcy portion of employee claims: namely, preserving that value of its contracts with USPS and other customers.  Since MFE handles distribution of a significant portion of the total volume of U.S. Mail, I believe that the failure to authorize payment of employee wage and benefit claims, etc. would also have a significant negative impact on the ability of the USPS to deliver mail nationwide, thus affecting literally millions of individuals and businesses who rely on the USPS for the timely delivery of mail.

　　　　18.　　MPS provides extensive ground transportation services to USPS throughout the United States.  It maintains terminals in multiple cities and utilizes a fleet of approximately 280 large tractor trailers to transfer mail and freight between distribution nodes.  Given the USPS's on-time delivery requirements, MPS is required to operate virtually twenty-four (24) hours a day seven (7) days a week.

　　　　19.　　MPS's contracts with the USPS account for approximately ninety-nine (99%) percent of its business.  MPS generated gross revenues of $91,013,702 in its fiscal year ending June 30, 2021, and gross revenues for the period July 1, 2021 through March 31, 2022 of approximately $81 million.

　　　　20.　　MPS employs approximately 465 full and part-time staff.  MPS also pays its employees weekly.  Each pay period ends at midnight on Saturday, and employees are paid the following Friday.  As with MFE, in order to allow paychecks to be distributed on time, the aggregate amount of wages and associated payroll taxes must be withdrawn from MPS's account no later than 10:00 a.m. on Thursday of each week.

　　　　21.　　From 12:01 a.m. on Sunday May 1, 2022 through May 5, 2022, MPS accrued wage obligations that ordinarily are due and payable on May 13, 2022.  The aggregate amount of payroll due on May 13, 2022 (which covers the pre-petition period and the post-petition period

May 6 to midnight May 7, 2022) is estimated to be $607,500.00. (The final amount will be calculated by Wednesday, May 11.)

22. As with MFE, MPS cannot operate without its employees, and I believe that any delay in payment of the pre-petition portion of the compensation owed to these employees would create serious disruption to MPS's business operations. Therefore, it is necessary and appropriate to pay the pre-bankruptcy amounts in order to preserve the value of MPS's contracts with USPS and other customers.

23. MFE and MPS maintain various employee benefit plans for their respective employees (health, dental, vision, life, disability, etc.). On average, MFE pays $30,987.68 and MPS pays $24,667.41 toward these premium costs each week.

24. In addition, under the health plan, MFE and MPS are partially self-insured up to $175,000.00 per employee. The total annual cost for MFE's coverage of health claims averages $2,880,340.60, and so its weekly average would be $55,931.16. MPS's average annual cost is $526,891.57, and so its weekly average would be $10,132.53. (The presentation of health claims for both MFE and MPS can vary materially from these weekly averages.)

25. MFE and MPS provide workers compensation benefits to employees. The workers compensation insurance plan has a $350,000 self-insured retention, and so variable amounts in claims are paid on a weekly basis. MFE's pay on average $1,127,551.30 for annual worker's compensation claims (or $21,683.69 per week), and MPS's average annual cost is $546,850.45 (or $10,516.35 per week).

26. In the ordinary course of MFE and MPS's business, employees are entitled to seek reimbursement for certain work-related expenses they incur in the performance of their employment responsibilities such as cell phone, travel, fuel, mileage, etc. I am informed that on average, the total amount annually for all reimbursable employee expenses is $41,939.00 for MFE (or $806.51 per week) and $179,884.00 for MPS (or $3,459.31 per week).

*Principal Causes of the Debtors' Financial Situation*

27. The essential mission of the USPS is the timely delivery of mail. THSs and STCs are built pursuant to strict specifications set by USPS. The construction, outfitting, and staff

training costs to open and operate THS/STCs are significant. Over the last two years, rollouts of the STCs were further complicated due to supply chain issues (i.e., delays in delivery of equipment) and COVID-19.

28. Under the parties' contracts, USPS pays MFE based on the number of items of mail it handles at an STC. Therefore, MFE's bids for STCs were based in part on what the USPS identified as the anticipated volume of mail that would be routed by the USPS to the STC for processing. While the volume of mail can vary from week to week, or month to month, from an overall standpoint, the USPS has not delivered the mail necessary to financially support these facilities. For example, when MFE bid to operate the Kansas City STC, the USPS estimated that it would route 3 million pieces of mail per month to that STC. However, the actual number of items sent to Kansas City for processing has only been in the range of approximately 1.3 million items per month. In addition to fixed costs such as rent, STCs require basic levels of staffing to operate (i.e., mail handling, security, etc.) and consequently a significant amount of labor and other variable costs associated with an STC cannot be avoided when the volume of mail is lower than anticipated.

29. In addition, at USPS's direction, MFE incurred certain extraordinary costs to open and operate STCs that to date have not been compensated by the USPS. For example, in or around September 2021, MFE was asked by USPS to take over two STCs located in Atlanta, Georgia, and Brandywine, Maryland. These facilities had been operated by a competitor, and I am advised that this competitor's failure to satisfy one or more performance measures prompted USPS to seek an alternative service provider. The competitor did not allow MFE to access or inspect the premises prior to the handover of control. But when we were able to take over operations in mid-November, we discovered *inter alia* that the high-speed sorting equipment had been delivered but was not operational, ancillary equipment (i.e. forklifts walkie riders etc.) was lacking and often inoperable, and approximately one-third of the loading docks were non-functional. We also discovered that since this was a new facility, the former operator's staff had not been fully trained. Few, if any, of the former operator's employees were transferred over to MFE.

30. In addition, the Statement of Work supporting the USPS's solicitations for bids contemplate that an STC will have a 60-day transition period before commencing full operations. But since USPS was facing its holiday peak mail delivery season in November 2021 when MFE took over, the USPS immediately directed large volumes of mail to the Atlanta and Brandywine facilities. Because the facilities were not fully functional at the time of the hand over, this caused a significant backup in MFE's ability to process mail at these STCs. At one point, the Brandywine STC experienced a 4-mile-long train of semi-trucks to the facility to unload the mail. This led to a huge disruption to the surrounding community.

31. USPS demanded the Debtors take immediate steps to address these problems and ensure timely delivery of mail. Among other things, at USPS's direction, the Debtors incurred significant costs to repair the facilities in order to make them fully operational. MFE also had to incur parking lot rental costs (to allow trucks to idle away from neighbors adjacent to the STC), transportation and temporary housing costs for on-site managers, recruiting and staff training costs. Significant additional fees for temporary workers were incurred due to the lack of operational sorting equipment to process the mail. The USPS demanded that MFE sort the mail by hand, which required MFE to deploy extraordinary amounts of temp labor for this task.

32. While we are still in the process of calculating the total amount of extraordinary costs associated with getting the Atlanta and Brandywine facilities fully operational, our current estimate is that these costs approximate $24 million. Similar issues arose at other STCs, resulting in additional extraordinary costs that remain unreimbursed.

33. In February 2022, Matheson began to experience serious cash flow issues. The combination of slow payment from the USPS, extraordinary temporary labor and other expenses, and revenue shortfalls from the reduced volume at multiple STC sites were the primary contributors to the liquidity strain. I therefore initiated negotiations with the USPS to assist us. We believe USPS is contractually responsible to compensate us for the extraordinary additional costs associated with making the STCs fully operational, as it: (a) was, or should have been, aware of the operational deficiencies at the facilities before MFE's takeover (because USPS maintains staff on-site at the STCs), (b) did not permit the STCs to ramp up processing capability

in the normal way, and (c) specifically directed MFE to take actions that resulted in incurring the extraordinary costs. Ultimately, our CEO Mark Matheson was able to convince the USPS to loan MFE $15 million. The USPS, however, demanded that MFE repay the loan within the three and one-half (3 ½) year remaining term of the USPS contracts. Under duress, MFE agreed to pay USPS $300,000.00 per month beginning in July 2022 with a balloon payment at the end of the term.

34.　　In addition to the repayment plan, USPS demanded that Matheson companies give up various over the road contracts and THS sites as a condition for making the loan. In fact, during negotiations concerning the loan, the VP of USPS Transportation Strategy stated that this event must "hurt" Matheson. But in order to obtain critically needed funding, MPS had no choice but to give up three (3) over the road contracts and MFE agreed to terminate services at seven (7) THS sites. Loss of these contracts will amount to a reduction of close to $28 million in revenue.

*Summary of Each Debtor's Assets and Liabilities*

35.　　I am a duly authorized custodian of the business records of both MFE and MPS. In the ordinary course of their respective businesses, each maintains accounting records reflecting the assets, liabilities, and financial condition of each entity. To the best of my knowledge, the records are prepared by the personnel acting on behalf of MFE and MPS at or near the time of the act, condition, or event reflected in such record.

36.　　At my direction, members of the Debtors' accounting department undertook a review of the Debtors' internal accounting records to determine MPS and MFE's respective assets and liabilities, and based on this review, I am informed and believe that the assets and liabilities of each entity (excluding intercompany receivables/liabilities and certain other items) were as follows as of the end the fiscal year ending June 30, 2021, and as of March 31, 2022 (the last period for which the companies have closed their books):

//

//

| **MATHESON FLIGHT EXTENDERS, INC.** | | |
|---|---|---|
| *Current Assets* | *YTD ending March 31, 2022* | *FY ending June 30, 2021* |
| Cash | $2,485,361.53 | $6,216,816.73 |
| Accounts Receivable | $13,824,007.78 | $11,282,229.34 |
| Prepaid Exp. | $3,018,211.30 | $869,844.32 |
| Other Receivable (USPS) | (est) $24,000,000.00 | $0.00 |
| *Fixed Assets* | | |
| Prop/Equip (net of deprec.) | $11,310,123.12 | $4,307,425.15 |
| Deposits | $1,235,114.58 | $1,011,830.75 |
| **Total Assets** | **$55,872,818.31** | **$23,688,146.29** |
| *Liabilities* | | |
| BofA (secured) | $4,892,836.46 | $0.00 |
| BMO (secured) | $329,560.19 | $496,403.16 |
| BofA Letter of Credit (secured) | (contingent) $7,000,000.00 | (contingent) $7,000,000.00 |
| Accounts Payable (Trade) | $8,563,643.27 | $1,537,909.69 |
| Accrued Exp. | $764,517.45 | $633,025.33 |
| Accrued Emp. Benefits | $512,435.91 | $236,485.31 |
| Accrued Payroll | $740,768.20 | $1,053,378.37 |
| Accrued PTO | $1,160,530.31 | $867,635.39 |
| Accrued Taxes | $375,563.08 | $324,634.60 |
| Misc. Other | $2,470,424.97 | $2,242,272.16 |
| USPS | (disputed) $15,000,000.00 | $0.00 |
| **Total Liabilities** | **$41,434,716.76** | **$14,391,753.01** |

//

//

//

| **MATHESON POSTAL SERVICES, INC.** | | |
|---|---|---|
| *Current Assets* | *YTD ending March 31, 2022* | *FY ending June 30, 2021* |
| Cash | $2,986,520.84 | $9,956,451.65 |
| Accounts Receivable | $407,285.35 | $309,481.99 |
| Prepaid Exp. | $2,919,678.71 | $1,533,229.62 |
| *Fixed Assets* | | |
| Prop/Equip (net of deprec.) | $15,749,843.15 | $17,465,088.96 |
| Deposits | $38,436.12 | $36,986.12 |
| **Total Assets** | **$22,101,764.17** | **$29,301,238.34** |
| *Liabilities* | | |
| PACCAR (secured) | $7,315,352.94 | $9,107,597.43 |
| BMO (secured) | $24,247.14 | $392,541.99 |
| BofA Letter of Credit (secured) | (contingent) $7,000,000.00 | (contingent) $7,000,000.00 |
| Accounts Payable (Trade) | $2,605,662.90 | $2,023,766.63 |
| Accrued Exp. | $1,448,387.64 | $536,244.09 |
| Accrued Emp. Benefits | $353,932.41 | $290,375.43 |
| Accrued Payroll | $292,124.53 | $596,301.64 |
| Accrued PTO | $456,751.14 | $437,758.99 |
| Accrued Taxes | $204,881.18 | $144,612.39 |
| Misc. Other | $809,255.26 | $562,165.30 |
| **Total Liabilities** | **$20,510,595.14** | **$21,091,363.89** |

37. As noted, the foregoing summary excludes intercompany obligations between MFE, MPS, MTI, and other Matheson entities. Those intercompany obligations arise from a variety of circumstances. Among other things, MTI is the lessor under certain real property leases for facilities where MFE operates. MFE is the sublessor, and consequently MFE owes rental payments to MTI. In addition, MTI provides accounting, human resources, and other administrative services to MFE and MPS, and MTI allocates the cost to these services to MFE

and MPS.  None of the First Day Motions, however, seek authority to pay any pre- or post-petition amounts that may be owing between the Debtors and any other Matheson entity.  Any payments that the Debtors may be obligated to make to a related party will be the subject of a separate motion.

38.　　The foregoing summaries also exclude contingent, unliquidated, and disputed legal claims asserted against the Debtors by various parties, some of which may be covered in whole or in part by insurance.

39.　　MFE and MPS are co-borrowers along with MTI and other related entities and guarantors under various term loans, equipment facilities, and letters of credit issued by Bank of America, N.A. and Banc of America Leasing & Capital LLC (collectively, "BofA").  As of March 31, 2022, BofA was owed approximately $4.9 million under the term loans and equipment facilities.  Three letters of credit in the combined principal amount of approximately $7.0 million have been issued to third party creditors.  The creditor beneficiaries under the letters of credit have not drawn down any amounts to date.   I am informed and believe that BofA asserts that its loans and other extensions of credit (including the contingent liability under the letters of credit) are secured by substantially all of MFE and MPS's assets, including property and equipment, cash and accounts receivable.  According to the above, the value of the collateral owned by MFE and MPS securing the asserted obligation to BofA as of March 31, 2022 exceeded $59.4 million**.**  In addition, I am informed that BofA holds mortgages on several parcels of real property owned by two related non-debtor entities Matheson Holdings, GP, and Matheson Properties LLC.  I am informed that BofA holds first deeds of trust on two parcels owned by Matheson Holdings in Washoe County, Nevada, and Adams County, Colorado, as well as a second deed of trust on a parcel located in Alameda County, California.  In addition, I am informed that BofA holds a first deed of trust on property owned by Matheson Properties in Sacramento County, California.  According to a collateral maintenance schedule prepared in connection with the BofA loans, the foregoing real properties were valued in the aggregate at approximately $12.3 million as of March 31, 2022.

40. BMO Harris Bank, N.A. ("BMO") financed MFE's purchase of certain vehicles and equipment (two 2019 JBT Model Commander 301 Cargo Loaders S/N 30119010 and S/N 30118032) and was owed $329,560.19 as of March 31, 2022. I am informed and believe that BMO asserts that its loan is secured by specified items (and any cash or non-cash proceeds thereof) reflected on UCC-1 financing statements filed on January 25, 2018, and April 1, 2019, with the Office of the Secretary of State of the State of California ("CA-SOS"). To the best of my knowledge, MFE is not in possession of any cash proceeds of any assets BMO asserts constitute its collateral.

41. PACCAR Financial Corp. financed MPS's purchases of various items of equipment, and as of March 31, 2022, MPS owed PACCAR $7,315,352.94. PACCAR filed a UCC-1 financing statement with the CA-SOS on May 22, 2018, and based thereon, I am informed and believe that PACCAR Financial asserts a security interest in any inventory and equipment manufactured by PACCAR, Inc. owned by MPS. To the best of my knowledge, MPS is not in possession of any cash proceeds of the said equipment that PACCAR Finance asserts constitutes its collateral.

42. MFE entered into a certain lease agreement with Toyota Industries Commercial Finance, Inc. concerning a Toyota forklift Model No. 8FGU25, serial number 81491. On August 3, 2017, Toyota Finance filed a precautionary UCC-1 with the CA-SOS, and based thereon, may assert that it holds a security interest in said forklift. To the best of my knowledge, MFE is not currently indebted to Toyota, and in any event is not in possession of any cash proceeds of the said forklift that Toyota has asserted constitutes its collateral.

43. MFE entered into a certain lease agreement with Xced Aviation Services, LLC concerning various items of equipment referenced in the parties' master leases and schedules attached thereto (including a 2016 Cargo Loader Commander C30j). On August 15, 2016, Xced filed two a precautionary UCC-1s with the CA-SOS, and based thereon, may assert that it holds a security interest in said equipment. To the best of my knowledge, MFE is not currently indebted to Xced, and in any event MFE is not in possession of any cash proceeds of the said equipment that Xced asserts constitutes its collateral.

44. US Bank Equipment Finance filed a UCC-1 financing statement with the CA-SOS on May 16, 2018, and based thereon, I am informed and believe that US Bank Equipment Finance may assert a security interest in specifically identified items of equipment owned by MPS. To the best of my knowledge, MPS is not indebted to US Bank Equipment Finance, and in any event is not in possession of any cash proceeds of the said equipment that US Bank Equipment Finance has asserted constitute its collateral.

45. Southcoast Air Quality Management District filed a UCC-1 financing statement with the CA-SOS on June 16, 2018, and based thereon, I am informed and believe that the Southcoast Air Quality Management District may assert a security interest in twelve 2017 Kenworth tractors owned by MPS. To the best of my knowledge, MPS is not indebted to Southcoast Air Quality Management District, and in any event is not in possession of any cash proceeds of the said equipment that Southcoast Air Quality Management District has asserted constitute its collateral.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed this <u>5th</u> day of May, 2022.

*/s/Charles Mellor*
Charles Mellor
